et al., oral argument, 15 minutes per side. Mr. Kuhn for the appellant. May it please the court, Matthew Kuhn for the appellant. I'd like to reserve 3 minutes for rebuttal. Kentucky's House Bill 454 does not ban a particular method of abortion. All it does is it changes how the abortion must be performed by requiring that a reasonable alternative procedure be performed. The available reasonable procedures that are alternatives are not new to the medical profession. Instead they've been used for many years. They're well studied in the medical literature and they're currently used by physicians here in Ohio and elsewhere. The Supreme Court's decision in Gonzales v. Carhart specifically allows Kentucky to change the how of an abortion procedure. Gonzales holds that abortion doctors do not have quote unfettered discretion in the course of their medical practice. It also holds that quote physicians are not entitled to ignore regulations that direct them to reasonable alternative procedures. That language governs this appeal. I'm a little confused as to Carhart, your citation of that. Are you arguing that that changes the level of deference that we pay to factual findings of the district court? I think that what Gonzales says you have to undertake a review of the record, the Gonzales court did. I think that under this court's precedent, which we discussed at page 19 of our reply, the Voinovich case and the Taft case says that rule 52 does not apply in this circumstance, requires an independent review of the record. I do, Judge Bush, getting to your question, I do think that under Gonzales deference is given to state legislatures, especially in areas of medical uncertainty. So I do think that there is deference that's given. So what are the findings that you're saying the legislature made that to which deference should be paid? So I think Gonzales talked about deference in two contexts. I think Gonzales talked about deference in the area of medical uncertainty. And it talked about that towards the middle of its opinion and it only got to deference to the legislature at the end of the opinion. The deference that we're primarily talking about here is to whether digoxin, potassium chloride and umbilical cord transection are reasonable alternatives. We had a five day trial here. More than a dozen experts testified about each of these alternatives. And while we don't think there's medical uncertainty as to their effectiveness, we think to the extent the court thinks there is, deference to the court is, deference to the state legislature is required under Gonzales. So are you saying that there's a finding of reasonable, that those are reasonable alternatives finding by the legislature and that goes to the risk involved in the procedure? That goes, in Gonzales it did go to the risk of the procedure, correct? There were abortion doctors in Gonzales that testified that the partial birth abortion procedure, which had been banned there, that that was quote significantly more dangerous for certain women with certain characteristics. And there were other experts that testified that no, no, no, it's not significantly more dangerous and the DNA is an alternative there. So we think that what Gonzales says was there is reasonable, or there is uncertainty there. And the language that Gonzales used I think is telling. Gonzales says that the uncertainty is quote unquote sufficient to uphold the statute against the facial constitutional challenge. So to the extent the court thinks there's uncertainty about the safety of the alternatives, or the reasonableness of the alternatives, I think that Gonzales dictates deference to the state legislature in that circumstance. I do want to mention a part of Gonzales that I think puts a thumb on the scale in favor of what the commonwealth has done here. As I mentioned earlier, the alternatives that are allowed under the statute are injections of potassium chloride, digoxin, and umbilical cord transection. Gonzales actually talked about two of those alternatives. So we think that's a thumb on the scale. Gonzales said about these two alternatives, some doctors, especially later in the second trimester, may kill the fetus a day or two before performing the surgical evacuation. And at the conclusion of his opinion, Gonzales came back to this issue and it said, and I'm quoting, it appears likely an injection that kills the fetus is an alternative. Now the alternative he was talking about there was to partial birth abortion. But if it's an alternative to partial birth abortion, it's also an alternative to DNA. So we think that Gonzales specifically foresaw and put a thumb on the scale in favor of what Kentucky has done here. Now EMW has made an argument that Hellerstedt has somehow altered the medical uncertainty holding of Gonzales. We don't think that's correct. First, Hellerstedt did not say that it was altering Gonzales. In fact, it expressly relied upon it. And when the Supreme Court has dealt with abortion case law and they're changing previous case law, they tell the lower courts about it. For example, in Casey, the court made clear that it was keeping the heart of Roe, but it told us, hey, we're abandoning the rigid trimester framework. So the Supreme Court is very clear when it's abandoning a prior precedent. There was no deference paid to the legislative findings in Hellerstedt, was there? So I think that's a misreading of Hellerstedt. And I would direct the portion of Hellerstedt that I'm relying on here is at 2309 and 2310. The court in Hellerstedt said that, quote, uncritical deference is not allowed, quoting Gonzales. That doesn't mean there's no deference. That just means there's not uncritical deference. Hellerstedt also specifically cited Gonzales' holding that we review legislative fact-finding under a deferential standard. So even if the court thinks that Hellerstedt has somehow changed Gonzales in some way, I don't think it's removed all deference that's given to legislative judgment. I'd note that the Eighth Circuit has looked at this very issue in the Jegley decision. And they said that because Hellerstedt expressly relied on Gonzales, and I'm quoting here, the court preserved its command that state and federal legislatures have wide discretion to pass legislation in areas where there's medical and scientific uncertainty. The plaintiff's argument on Hellerstedt reduces to the notion that Hellerstedt somehow undermined the reasoning of Gonzales. And I don't think that's a decision for this court to make. We've cited in our brief, and Ohio cited in its amicus brief, the Agostini decision that the court's job, this court's job, is to apply the most applicable precedent, not to guess about whether reasoning has been undermined. Moving on to the second error that we, critical error, that we think the district court made here was that it can... The procedure you just mentioned is an additional procedure that's not necessary to perform the abortion procedure. So you're adding procedures that may not be medically necessary. What sort of burden does that additionally impose? What is the oxygen injection? So for example, the joxan injections, let's start with that one. That is not a new procedure. There's a study that was relied on at trial called the Hearn Study that said the joxan has been, quote, widely practiced in the last 20 years. When the... Well, it's not new, but it's an additional procedure that the woman doesn't have to have to complete or have the abortion performed. That's correct. It's a procedure that would immediately proceed, or 24 hours in the case of the joxan, proceed the D&E procedure. And the district court, I think... Does it require an additional visit to the clinic to have the abortion done instead of doing it in one visit? So the answer to... It has to be two visits. The answer to that is largely no, and let me explain the qualification. The district court here said that it would, but the testimony at trial was that for women who are between 15 and 16 weeks of pregnancy, it may in fact require a second trip, but from beginning of 16 weeks all the way to the end of 21.6 weeks, two day procedures are required anyway because they have to, starting at 16 weeks, have to get sufficient dilation, and that requires two different days. On the two trips point, for the one week that it would require a second trip, we'd point the court to Casey's discussion of the 24 hour waiting period. We think that that's clear, that that's been allowed. The district court did not deal with that in its opinion. Judge Clay, I think your question had an inherent question about the additional risk that this additional procedure imposes, and I want to discuss that directly, and I want to discuss that by talking about what I think is an admission that the plaintiffs have made in this case. In their complaint, they pled that the D&E procedure is, quote, one of the safest medical practices. We put on evidence in our five day trial that these fetus-cidal injections that are required by House Bill 454 are safer than the D&E. Not just that they're safer, but one of our experts testified without contradiction that the risks from D&E are astronomically higher than the risks associated with fetus-cidal injections. That's Dr. Berry who testified to that. So taking that testimony, which the EMW did not contradict at trial, they're telling you that this is such a risky procedure, but it is astronomically safer than a procedure that they pled in their complaint was, quote, one of the safest in contemporary medical practice. We think that's an important point that overrules all of the district court's discussion of risk. The district court said, hey, digoxin could have a risk of infection or a risk of extramural delivery. But the question for the district court was not whether there's a theoretical risk, but whether there is a substantial medical risk. That's directly from Gonzales, a significant medical risk. This court in its TAF decision from 2003 told us what a significant medical risk is not. This court said that insignificant risks or risks generalized to the entire population of women seeking an abortion are not significant medical risks to violate the undue burden standard. Didn't the district court find that there's a 50 to 20 percent failure rate on these injections and no studies have been done as to whether a second injection would be safe? So let me take both of those in seriatim. First, we think one of the most profound errors made by the district court was that finding of a failure rate of 5 to 20 percent for digoxin. The district court acknowledged that KCL, potassium chloride, works almost all the time if you get it into the heart. But for the 5 to 20 percent failure rate, the district court overlooked that EMW's expert, Dr. Davis, when asked about her best estimate for the failure rate of intrafetal digoxin, she said her best estimate is it has a 2 percent failure rate. That means it's 98 percent effective. Now to be clear to the court, I'm not hiding that intra-amniotic injection was slightly, intra-amniotic injections of digoxin were slightly less effective. But the point of the matter is that intrafetal digoxin injections are 98 percent effective according to their own expert. And we put in evidence that she may have been understating things. The HERN study that had 1,600 women who received the injection, it was 100 percent effective there. The TACHI study... The fact, though, that there is some percentage of the time that the injection isn't going to work apparently. Correct. So does that impose liability on the doctor? So I think that's the hardest issue in this case is what to do in the case of a failed injection. Again, assuming the 2 percent failure rate, it's successful 98 percent of the time. This court has looked at the large fraction analysis, which is what's required to invalidate a statute in this circumstance, facially, which is what the plaintiffs have asked, and has said that 12 out of 100 does not constitute a large fraction. So assuming we're talking... I'm asking about enforcement of the law. Would you agree the law would impose liability on the doctor who does the injection but the injection doesn't succeed? So talking about it in the abstract, there is a health exception. But we don't think the health exception is going to automatically be triggered by a failed injection. I would submit to the court that if there are concerns about what happens when there's a failed injection, I think the proper remedy in that circumstance is to craft just a very narrow, as applied, invalidation there. Under the IOT decision, which is what we've discussed, and that's very similar to IOT, the court there talked about how the statute was constitutional in all but a few instances. And Ohio, in its amicus brief, talked about the current challenge that it has to its D&E statute. And Judge Barrett there from Ohio actually crafted narrow, as applied, relief as to a failed injection just like that. So we would submit to the court that that would be the proper course in that scenario. Let me ask you this. Is it true that the procedure you're talking about has to be performed by the 13th week of pregnancy, whereas most D&Es perform between 15 weeks and 21.6 weeks? So that's correct. So the statute begins to apply at the 13th week of pregnancy, talking about from last menstrual period. The statute itself talks in terms of post-fertilization measuring a pregnancy, so it starts at 11 weeks L&P. Plaintiffs have testified that they do not begin performing D&Es until 15 weeks, and in some circumstances, Dr. Franklin acknowledged, maybe 16 weeks. So Judge Clay, yes, I agree with you that the applicable time period here is 15 to 21.6 weeks L&P. See my time has expired. Thank you, the court. May it please the court. Good morning. Andrew Beck, representing the plaintiffs' appellees. Under decades of binding Supreme Court precedent, a law banning the most commonly used second trimester abortion method is unconstitutional. As this court made clear in Northland Family Planning, after Gonzales and Stenberg, a ban on D&E is simply barred. HB 454 flies in the favor. The commonwealth's arguments here are foreclosed not just by the binding precedent, but by the well-explained findings from the district court, which match the consensus of fact-finders hearing these cases. As Judge McKinley determined- About the findings of the district court, were there any findings as to any actual patients of EMW? Meaning, did the court make specific findings about- I'm sorry, I don't understand your Honor's question. Did any patients testify? That's one question. No, no patients of EMW testified in the case. The court heard expert testimony discussing the practice of these medical procedures, and it also heard testimony from physicians in terms of what these procedures meant for their patients under the- for example, plaintiff's expert attempted one of the procedures, digoxin, on about ten occasions, and talked about the pain, the failure rate, the inefficacy of the procedure, and so from that perspective, indicated what the procedure was like from a patient perspective, but no, the physicians and other experts in other areas of medicine and medical ethics were the focus of the testimony. Was there any evidence presented as to the preference of patients for fetal demise as part of a D&E procedure? Yes, your Honor. There was testimony about what is reflected in the literature. Defendants relied upon a study that indicated a preference for fetal demise, but defendant's own expert who testified about that study, Dr. Thorpe, conceded that the study- that further research is necessary to determine whether or not patients would actually prefer fetal demise if they understood that it provided no medical benefits. Essentially, the patients in that study were masked, and the assumption was that the procedure performed would carry a medical benefit, and further research would be necessary to determine whether or not that would be- bear out. But in any event, the Dr. Thorpe- My understanding is that the doctors in this case do not have the training to perform any of the fetal demise procedures that are required by the statute. Is that correct? Particularly with respect to potassium chloride and umbilical cord transection, that's true. With respect to digoxin, at least intra-amniotic digoxin is the easiest of the procedures, but it's also the one with the highest failure rate. So if there's a patient that goes into EMW and asks for the fetal demise procedure to be done as part of D&E, what would be their response? I'm not sure it's reflected in the record, your Honor, but my understanding is that the patient- the physicians would counsel the patient that it carries risks, included- risks that aren't justified by the benefits, and if the physician- and if the patient wanted an abortion procedure and wanted that to be an injection prior to the procedure, they wouldn't be able to obtain it at EMW because it can't be provided there. So would you agree that there could be a potential conflict of interest between the patient who wants the fetal demise procedure done and the doctor who says that she or he is not able to perform it? No, your Honor. If the patient wants that procedure, that wouldn't be provided at EMW, and particularly as the evidence in the record establishes, when patients are informed of facts including the facts that the procedures carry no medical benefit, the fact that the state interest that the state has invoked here about the possibility of fetal pain perception is nonexistent during any of the times when abortions are performed in Kentucky, upon educating patients about those facts, the testimony in the case is patients don't want the injections. What about the- I believe there's something in the record from Planned Parenthood of Los Angeles where they actually did offer the fetal demise procedure as part of D&E. Is that- would that be contrary to what you just stated? No, your Honor. We definitely don't- we certainly acknowledge that certain doctors around the country do perform digoxin injections, although under very different circumstances than what Kentucky is talking about here, and that doesn't take away from the district court's well-supported findings that the procedures carry significant health risks. So in terms of what the practice is nationally, in terms of the limited number of doctors who do perform these procedures, first of all, no one is performing it before 18 weeks when half the D&Es in Kentucky are performed. Of those digoxin injections that occur, or D&Es that occur after 18 weeks, the testimony shows, first of all, fewer than 8% of doctors nationwide even attempt any form of fetal demise, so it is a minority practice. And then most critically, among the doctors who attempt this procedure, they don't do so in the manner that Kentucky is insisting upon here, because no one in the country attempts a digoxin injection without the ability to perform a D&E in cases of failure. We know the injections fail up to 20% of the time, as Judge McKinley found, in cases where there is a contraindication, if the injection can't be accomplished because the woman is obese, or because she has fibroids, or caesarean scar tissue, or factors related to fetal positioning, or if the injection is simply too painful. Under all of those circumstances, any doctor performing these injections nationwide can perform a D&E, but this law requires... ...and asks for fetal demise before the D&E. What are her options? If a patient wants a fetal demise before a D&E after being counseled, that it provides no medical benefit, and the doctors view it as unethical medical practice, at least within their... What are her options? Her option, I think, would have to be to seek a different abortion provider. And where would she go? I believe she would have to leave the state for that service. Okay. And you would agree that would be her right, as a patient, to do that? Yes. She's... We... EMW can only provide the procedures that it's able to provide under the circumstances it can provide it. She would have to make a choice under those circumstances. And in those circumstances, you'd agree it's in her interest that the EMW doctor have the training to provide the fetal demise procedure? No, Your Honor. Absolutely not. Because the determination as a medical matter, first of all, it is a little practice procedure, and the consensus from major medical associations, including the Society for Family Planning, which sets the gold standard in this area, is that the harms don't justify the benefits. And so plaintiffs in this case are well within the majority practice of doctors nationwide performing abortions who don't perform the procedures precisely because they carry such significant health risks. Doctors don't perform procedures in general that harm their patients and that carry no health risks. That's true of medicine in general, and the doctors in this case practice medicine according to evidence-based standards. And what the evidence shows with respect to digoxin injections in particular, and Judge McKinley found, reflecting a consensus among fact-finders, is that the procedures carry... Fibers? Judge McKinley. Is it McKinley in this case? Yes. Sorry. I apologize. Yes. There's a number of cases, Your Honor. Okay. Judge McKinley in this case, and Judge McKinley found, reflecting a consensus among fact-finders, that digoxin carries an elevated risk of extramural delivery, which means the patient goes into labor outside of a healthcare sitting, whether that be at home, in the grocery store, delivers, and can have hemorrhage and require a blood transfusion. That's going to happen one out of every 53 times a person has a digoxin injection. That's reflected in the testimony at page 4405, quoting the study by Dean, which is the best study in the literature, the only study that contains a control group and so allows for comparisons between women who have digoxin injections and those who don't. Women who have digoxin injections are going to suffer an infection one out of every 36. One out of every 36 women in Kentucky forced to undergo these injections is going to have an infection that otherwise would not occur. Infection can be an extremely serious health condition, leading to sepsis, chloroamnionitis, can require hospitalization, and emergency room visits. That study further reflects that substantially elevated rates of hospitalization and emergency room visits among patients receiving digoxin, as Judge McKinley found, and as the consensus of fact finders viewing these cases have found. And that's, I think, an important point here. I want to take it back for a moment. I want to respond to the statement made by counsel for the state about, they claim an admission made in the complaint regarding D&E being one of the safest procedures. How do you respond to that? They say that that's an admission that somehow that the fetal demise procedure is safer than the D&E, therefore that admission should bind your client. A couple points, Your Honor. The first is, these procedures that we're speaking about are layered on top of the risks of the D&E procedure. That's an important thing to bear in mind because everyone in this case agreed, all of their experts, and I think Kentucky itself agrees, there is no procedure without medical risk, and so we're necessarily talking about layering additional risks on top of that. The statistics I just quoted to you from the record about the risks associated with digoxin amply demonstrate that digoxin is substantially riskier than a D&E procedure. And what Kentucky is essentially doing here is picking and choosing lines from testimony that it wished Judge McKinley found persuasive. But Judge McKinley decided to rely upon what the record, the best studies in the record, what the best testimony in the record established, which is, these procedures substantially elevate those risks. He didn't adopt their experts' testimony, and that takes us back to the clear error standard. The words clearly erroneous did not come up in the argument until this point from the other side here, and the fact that their opening brief didn't even mention the words clear error except in the passing reference in the standard of review is symptomatic of their failure in this regard. The clear error standard has to pay particular deference to Judge McKinley here who had the witnesses giving live testimony. He could make credibility determinations, judge witness demeanor, and it's not enough to pick lines of testimony that Kentucky wishes Judge McKinley had found persuasive. It was incumbent upon them, as the 11th Circuit determined in Williamson, to show that there was no evidence upon which Judge McKinley could make that determination. And of course that's not true here because literally every single court that has looked at this evidence has reached the exact same determination. And that takes us to another important point about the clear error standard, which is, as the Supreme Court stated in Glossop versus Gross, where there is a consensus of fact finders on a factual issue, and that fact finding has been affirmed on appeal by multiple appellate courts, as is true here as the 11th Circuit reaffirmed these factual findings, the Third Circuit in the Farmer case, the Kansas Supreme Court in the D&E challenge out of the state court system. All of these findings have been reached by fact finders based on the same body of medical evidence affirmed by multiple appellate courts. Under those circumstances, a factual finding, according to the Supreme Court in Glossop, is even less likely to be clearly erroneous. And so Kentucky is really swimming upstream here in arguing and trying to pick lines from testimony. It had to demonstrate that the findings were clearly erroneous, and it has absolutely failed to do so. So, counsel, your overarching argument is that the Hellerstadt balancing test should be applied and the court should look at whether the risks of the procedure outweigh the burden, and you're opposing counsel saying that the whole matter is more complicated than that, taking into account the Gonzalez case and some of the other arguments that you're opposing counsel was making, but we go back to whether we balance the risks against the burdens and basically your overarching theme here, is that right? Yes, Your Honor. I think the courts that have addressed the question of state interest that Kentucky is asserting here after Hellerstadt have all held that Hellerstadt applies, that there are not multiple abortion standards or undue burden standards, there's a unitary undue burden standard, and Hellerstadt told this court how to apply it. And Hellerstadt didn't say that Gonzalez applied a different standard. Hellerstadt interpreted Gonzalez and said, here is what Gonzalez means under these circumstances. It is not enough for a state to assert a state interest, valid as that may be in the abstract, the court has to also look to the nature of the burdens and where the burdens impose a substantial obstacle as they unquestionably do here, no state interest is sufficient to justify that obstacle. That's the premise of Casey and it's been reaffirmed and interpreted through Gonzalez and Hellerstadt, but as the 11th Circuit made clear in the Williamson case, as the 7th Circuit held in the Planned Parenthood versus Box case, there's just no support for this argument that there is shifting undue burden standards that vary depending on the nature of the state interest. There is a single undue burden standard and Hellerstadt is the most recent decision telling this court how to apply it. Do you want to comment on what the state claims are the benefits from imposing the procedure that they would like to have accepted here? So I think as we say in our brief, your honor, we think the evidence shows that as legitimate as some of those interests may be in the abstract, there are real questions as to whether or not this law advances them, but I think the more fundamental point is this. The 11th Circuit acknowledged fully the nature of those interests on an identical or similar record concerning a similar law and nevertheless held that no matter the nature of those interests, no matter how much the law advanced those interests, and we think there are questions about that, but the 11th Circuit credited those interests and said it doesn't justify the burdens. Because this law would result in the elimination of abortion access in Kentucky starting at 15 weeks because the procedure that the state says are workarounds are in fact not feasible and would subject patients to significant health risks, in short, because the procedures don't do what Kentucky says they do, abortion access would dry up entirely. That is the essence of a substantial obstacle and no matter the nature of the state interests, it can't be justified under binding Supreme Court precedent. Now, is this the only abortion provider in Kentucky at the present time? Yes, your honor. And they don't have personnel who can perform the procedure as I understand on the record in the case, is that right? That's absolutely correct, your honor. With respect particularly to two of the procedures, intracardiac injections of potassium chloride, which is performed only by a small number of subspecialists in other states, and with respect to Kentucky's argument in that regard, I would direct the court's attention to the Supreme Court's decision in Danforth, where the Supreme Court made clear that the analysis focuses on the competency of the doctors in the state to perform the procedure in question. In Danforth, Missouri had pointed to a little-used procedure provided elsewhere in the country by specialists, and the Supreme Court said, no, the analysis focuses on whether the doctors at clinics can perform this procedure, and with respect to that question concerning potassium chloride, the consensus, once again, of every single court to have looked at this evidence is that even trained, qualified abortion providers at clinics can't perform this procedure because it is so specialized that it's only done by a few doctors, a small number of doctors in the country. All right. I see that you're out of time there. Yes.  Counsel, should the court be concerned about the fact that the procedure you're advocating that this clinic can't, doesn't have personnel that can perform the procedure, and it's the only abortion provider in the state currently? What do you have to say about that? So I think Gonzales answers the court's concern there, and the quote from Gonzales that I quote, does not have unfettered discretion in the course of their medical practice. The state of Kentucky can change medical practice. I note for the court. How does that relate to the practical difficulty of the fact that the only abortion provider cannot perform the procedure? I don't think they said they, let's talk about the procedures. Both of the doctors talked about how they thought that they would be comfortable, they were less than clear, but the best reading of the testimony is they thought they could be comfortable doing intra-amniotic digoxin injections. I note for the court that a survey of abortion providers has been done, and one in four abortion providers nationwide are already regularly performing fetal demise procedures. And I would note that when you look at the data, Dr. Thorpe testifies about this, that 87% of the providers who are regularly doing these procedures are OBGYNs. The plaintiff's doctors are OBGYNs. Under Gonzales, they cannot sit on their hands. I note for the court that there are two clinics currently here in Ohio that are performing these procedures. Surely plaintiff's doctors in Kentucky can live up to what the doctors here in Ohio are doing. I note for the court that in the Ohio case, that there were two abortion providers that were already doing digoxin injections. Judge Barrett let the law go into effect. And a third abortion provider recently filed a notice with Judge Barrett that said it's quote, taking steps to begin digoxin injections. This is something that if the law were to go into effect, the plaintiff's, there's one in four, 87% are OBGYNs. To answer Judge Bush's question, the evidence as to preferences of women, the two studies that we'd like the court to look at are Jackson, which said that 92% of women have a strong preference for fetal demise beforehand. The Nuka-Tola study is the other, 73% of women have a preference. The Nuka-Tola study was the one that was funded by Planned Parenthood, where Planned Parenthood required digoxin before all second trimester abortions. I want to talk quickly about the Hellerstedt point, and does Hellerstedt balancing apply here? I would direct the court to the sentence before Hellerstedt imposes its balancing test. And it talks about the quote, unquote, the existence or non-existence of medical benefits. I think if the court looks at the sentence before the balancing test, it's clear that Hellerstedt is focused on medical benefits. And that makes sense, right? Because medical benefits can be studied, they can be looked at rigorously, and they can be weighed. The state's sovereign interest in respecting unborn life and protecting the integrity of the medical profession, those are intangible, immeasurable interests. And so Hellerstedt doesn't make sense in that context. In conclusion, Your Honor, there was testimony at trial from Dr. Berry. We should not use the Hellerstedt balancing test. I want to be clear as to what you're saying here. So I'm making a two-pronged argument. I think Gonzales controls and Hellerstedt doesn't change Gonzales. To the extent the court disagrees, the colloquy that you had with opposing counsel, the benefits here, the district court found that the benefits are basically admitted. And so I think that's a very different circumstance from Hellerstedt, where they noted that Texas conceded an oral argument, it couldn't find one woman for whom the admitting privileges benefited. The benefits here are substantial. So in conclusion, we'd ask the court to reverse the district court. There was testimony at trial of a DNE abortion where a doctor witnessed a beating heart come out. Surely the Commonwealth of Kentucky has the ability to say that can't happen in our borders. We'd ask you to let the will of Kentuckians stand as reflected in House Bill 454. Thank you, Your Honor. All right. Thank you very much. The case is submitted. And once the table is clear, the next case may be called.